# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5733 | **DATE** | 9/23/2003 |
| **CASE TITLE** | Landingham vs. Potter | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [48-1] is granted. Judgment entered in favor of the defendant. All future dates, including trial date, are stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 24 2003 date docketed | 66 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. Mailed by MD. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 03 SEP 24 AM 8:24 | 9/23/2003 date mailed notice | |
| MD courtroom deputy's initials | | Date/time received in central Clerk's Office | MD mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
SEP 2 4 2003

| | |
|---|---|
| EDWARD LANDINGHAM, | )<br>) |
| Plaintiff, | )<br>) |
| vs. | ) No. 99 C 5733<br>) Judge Joan H. Lefkow |
| JOHN E. POTTER,<br>Postmaster General of the<br>United States Postal Service | )<br>)<br>) |
| Defendant.[1] | )<br>) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Edward Landingham ("Landingham"), has filed a first amended complaint against defendant, John E. Potter, Postmaster General of the United States Postal Service, alleging that the United States Postal Service ("USPS"), his former employer, discriminated against him on account of his disabilities, which he represents are alcoholism and chronic back pain, in violation of the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* ("RA"). Before the court is defendant's motion for summary judgment. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 791. For the reasons set forth below, the motion is granted.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and

---

[1] Under Fed. R. Civ. P. 25(d)(1), Mr. Potter, as successor in office to William Henderson, is automatically substituted as defendant.

affidavits that are part of the record. Fed. R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

The USPS employed Landingham as a mail carrier[2] at the "Fort Dearborn" post office station, located at 540 North Dearborn, Chicago, Illinois, from 1970 until his removal on July 19, 1996. (Def. L.R. 56.1 ¶ 1, 20.) From January 1996 to January 1997, Jerry Averhart ("Averhart"), was a supervisor of customer service at Fort Dearborn. (Pl. L.R. 56.1 ¶ 4.) Beginning in January 1996, Rosa Roberts ("Roberts") was also a customer service supervisor at Fort Dearborn. (Pl. L.R. 56.1 ¶ 5.) Customer service supervisors are responsible for supervising the mail carriers assigned to a particular station; thus, while Averhart and Roberts were assigned

---

[2]As a mail carrier, Landingham was responsible for "casing" or grouping mail by location and delivering mail. (Pl. L.R. 56.1 ¶ 8.) Prior to 1996, Landingham's work day began at 10:00 a.m. and he drove a truck to deliver mail. (Pl. L.R. 56.1 ¶¶ 9-10.) At some point in late 1995, the USPS removed Landingham from his truck and changed his start time to 7:00 a.m. and then again to 6:00 a.m. (Pl. L.R. 56.1 ¶ 10.)

2

to Fort Dearborn they supervised Landingham. (Pl. L.R. 56.1 ¶ 4.) Iloma Perkins ("Perkins") was the customer service manager at Fort Dearborn and was responsible for approving suspensions and removals issued by supervisors. (Pl. L.R. 56.1 ¶ 6.)

**Landingham's Alcohol and Back Problems**

Beginning sometime between 1965 and 1967, while Landingham was serving in the United States Army, he began abusing alcohol. (Pl. L.R. 56.1 ¶ 12.)[3] Landingham was abusing alcohol when the USPS hired him in 1970 and the abuse continued during all times relevant to this action. (Def. L.R. 56.1 ¶ 8; Pl. L.R. 56.1 ¶ 13.)[4] Although Landingham described himself as a "functional alcoholic," he testified that his drinking affected his ability to work, particularly the thoroughness of his performance and his ability to get to work on time. (Def. L.R. 56.1 ¶ 8.) Landingham tried to cover up his alcohol use from management, although he alleges that the USPS knew that he abused alcohol because of his smell, behavior and appearance.[5] Moreover, in 1993 and 1995 the USPS requested that Landingham participate in the Employee Assistance Program ("EAP") "to assist with his drinking problem." (Pl. L.R. 56.1 ¶¶ 15-16.) According to Landingham, his alcoholism resulted in erectile dysfunction. (Pl. L.R. 56.1 ¶ 19.) He also claims his alcoholism substantially limited his interpersonal relations and his ability to see, learn and maintain personal hygiene. (Pl. L.R. 56.1 ¶¶ 20-22.)

---

[3]Landingham received an honorable discharge from the Army in 1967 after he contracted tuberculosis. (Def. L.R. 56.1 ¶ 7.)

[4]Landingham has not used alcohol since January 1, 2002. (Def. L.R. 56.1 ¶ 8.)

[5]Averhart recalled that Landingham had "glazy" eyes and smelled like alcohol while at work. (Pl. L.R. 56.1 ¶ 18.) On February 23, 1996, Averhart instructed Landingham to go to the first aid station because he smelled of alcohol. (*Id.*)

3

In 1971, Landingham injured his back while on the job. (Pl. L.R. 56.1 ¶ 23.) He reported the injury to management, received worker's compensation benefits and missed several days due to the injury. (*Id.*) In 1973, Landingham re-injured his back at work and again reported the injury to management. (Pl. L.R. 56.1 ¶ 24.) He underwent surgery for the condition. (Pl. L.R. 56.1 ¶ 24.) In addition to surgery, Landingham has sought other medical treatments for alleviation of his back pain, including acupuncture, prescription medication, use of a back brace, physical therapy and the use of a nerve stimulation unit. (Pl. L.R. 56.1 ¶ 26.) Throughout his employment, Landingham was occasionally assigned to light duty because of his back condition. (Pl. L.R. 56.1 ¶ 25.)

Landingham's back pain worsened in 1996. (Pl. L.R. 56.1 ¶ 27.) To help control the pain, Landingham was prescribed pain medicine that contained codeine. (*Id.*) He also wore a back brace that could be seen through his work shirt. (*Id.*) Despite this treatment, Landingham claims to have experienced muscle spasms and intense pain that substantially limited his ability to sleep. (Pl. L.R. 56.1 ¶ 28.) Moreover, Landingham claims that his back condition substantially limited his ability to walk, sit for long periods, twist and bend. (Pl. L.R. 56.1 ¶ 30.)

**USPS's Disciplinary and Attendance Policies**

The USPS issues discipline progressively, starting with a counseling session and moving to a written warning, a seven-day suspension, a fourteen-day suspension and then removal. (Pl. L.R. 56.1 ¶ 42.) These progressive discipline procedures must be followed unless the employee commits a serious offense, such as fighting or shooting a gun. (Pl. L.R. 56.1 ¶ 43.) Poor attendance is not a serious enough offense to justify departure from the procedures. (*Id.*) When considering issuing disciplinary action, USPS supervisors are expected to consider disciplinary

4

action that has occurred within the past two years and to follow the progressive steps in order. (Pl. L.R. 56.1 ¶ 44.) Concerning discipline for attendance, supervisors are also expected to review the employee's absence analysis forms, the leave request forms and referrals to the EAP, all of which are kept in the employee's personnel file. (*Id.*)

USPS policy requires that unless there is an emergency situation, a Postal employee is supposed to seek approval for all leave requests before taking leave. (Def. L.R. 56.1 ¶ 16.) If an employee takes leave without prior approval, he is considered absent without leave ("AWOL"). (*Id.*) Pursuant to USPS policy, unscheduled leave, even if it is approved unscheduled leave, can be considered against a Postal employee for discipline purposes. (*Id.*)

When a USPS employee is suspended, a suspension notice must be issued to the employee in the presence of two supervisors and a union steward. (Pl. L.R. 56.1 ¶ 45.) An employee is then given the opportunity to sign a receipt of the notice. (*Id.*) If the employee refuses to sign the notice, this refusal must be noted on the notice and initialed by one of the supervisors. (*Id.*) Customarily, the dates during which the employee is to serve the suspension are inserted on the notice of suspension. (*Id.*) In 1996, suspensions were not coded as "suspensions" on the USPS's absence analysis reports, and they may have been coded as "Leave Without Pay" or "LWOP." (Pl. L.R. 56.1 ¶ 46.)

Due to staffing concerns, the USPS sometimes institutes "paper suspensions," which result in the suspended employee still being expected to report to work and is paid for his or her time, but a record of the suspension is included in the employee's personnel file and is considered against the employee in future disciplinary action. (Pl. L.R. 56.1 ¶ 39.) When a "paper suspension" is given, the employee is clearly informed both in writing and verbally. (*Id.*)

5

Usually appearing on the notice of suspension would be words to the effect of "while this suspension does not result in the loss of time or pay, it is equivalent to and is of the same degree of seriousness as a time-off suspension." (*Id.*)

**USPS's Discipline and Termination of Landingham**

On November 15, 1995, Landingham was issued a "Notice of Removal" for engaging in unacceptable conduct on two occasions. (Pl. L.R. 56.1 ¶ 15.)[6] Landingham subsequently grieved the Notice of Removal through his union's grievance procedure. (*Id.*) On January 24, 1996, as part of a grievance settlement, Landingham was issued a "Notice of Suspension of 14 days or less" which reduced his Notice of Removal to a 7-day suspension. (*Id.*) Landingham maintains that he served this suspension by not working from January 29, 1996 through February 6, 1996. (*Id.*) He further states that this was not a "paper suspension." (Pl. L.R. 56.1 ¶ 41.)

Landingham's personnel file contains a "Notice of a Fourteen-Day Suspension" dated February 5, 1995. (Pl. L.R. 56.1 ¶ 47.) This notice is incomplete because it lists no dates for serving the suspension, Landingham did not sign the notice, and there is no required notation indicating that he refused to sign. (*Id.*) Landingham claims that he never received this notice because he was suspended until February 6, 1996. (*Id.*) Averhart previously denied any involvement with the suspension in an affidavit provided to the EEOC; however, he later admitted in his deposition that this was incorrect and that he apparently prepared the February 5, 1996 "Notice of Fourteen-Day Suspension." (Pl. L.R. 56.1 ¶ 48; Averhart dep. at 176-78.)

---

[6] Averhart did not issue the Notice of Removal and was not working at Fort Dearborn at the time it was issued. (Def. L.R. 56.1 p. 15.)

In preparing the suspension notice, Averhart improperly considered disciplinary action taken against Landingham that was nearly four years old. (Pl. L.R. 56.1 ¶ 48.) Averhart also considered an oral counseling session allegedly conducted by Roberts with Landingham on January 27, 1996, and Landingham's seven-day suspension which resulted from the grievance settlement. (Pl. L.R. 56.1 ¶¶ 49-50.) Finally, Averhart considered Landingham AWOL during the time he spent on suspension between January 29, 1996 and February 6, 1996, and counted those 48 hours against him for disciplinary purposes. (Pl. L.R. 56.1 ¶ 51.)

Thereafter, on April 29, 1996, Averhart issued Landingham a Notice of Removal. (Pl. L.R. 56.1 ¶ 53.) Landingham maintains that Averhart relied on the February 5, 1996 "Notice of Fourteen-Day Suspension" which was never issued to Landingham. (Pl. L.R. 56.1 ¶ 54.) Averhart, as evidence of Landingham's attendance problems, also charged Landingham with several alleged unscheduled absences. (Pl. L.R. 56.1 ¶ 55.) Landingham maintains that several of these absences should not have counted against him because they were either based on an illness, requested in advance or approved. (Id.)[7] These absences included:

A. On February 14 and 15, Landingham called in to inform his supervisor that he would be two hours late. (Pl. L.R. 56.1 ¶ 55.) Both leave requests were ultimately approved without further comment. (Id.)

B. Landingham requested February 15, 1996, off, but the record is unclear as to when such a request was made. Landingham stated in his deposition only that this request "wasn't the same day. If I requested leave, I wasn't there." (Landingham dep. at 97.) Landingham claims that this was emergency medical leave, but that it was counted against him for disciplinary purposes. (Pl. L.R. 56.1 ¶ 55.)

---

[7] Defendant's position is that these absences were all "unscheduled leave." (Def. Resp. to Pl. L.R. 56.1 ¶ 55.)

7

C.  On February 23, 1996, Averhart instructed Landingham to seek emergency medical treatment two hours before the end of his shift. (*Id.*) Averhart then counted Landingham as being AWOL on this day. (*Id.*)

D.  On February 23, 1996, Landingham submitted a request for annual leave for February 24, 1996. (*Id.*) Averhart did not approve the request and did not explain why, as USPS policy requires. (*Id.*) Averhart then counted Landingham as AWOL on this day. (*Id.*)

E.  On March 14, 1996, Landingham called in to inform his supervisor that he would be approximately three hours late. (*Id.*) Averhart approved the request without further comment on March 14. (*Id.*) Nonetheless, this leave was classified as AWOL on Landingham's removal notice. (*Id.*)

F.  About mid-way through his shift on April 11, 1996, Landingham began experiencing severe back pain and muscle spasms and requested leave to seek medical treatment. (*Id.*) Landingham saw a doctor and produced a physician's note to Averhart on the same day. (*Id.*) Averhart denied Landingham's request for leave, rejected the doctor's note and classified Landingham as AWOL. (*Id.*)

Landingham grieved his removal to Perkins, which she denied. Perkins did, however, later admit that she only relied on the Notice of Removal and did not review Landingham's personnel file, disciplinary record or attendance record to verify the alleged absences and the disciplinary actions issued. (Pl. L.R. 56.1 ¶ 56.) Perkins issued Landingham a letter finalizing his removal on July 11, 1996, and stated the removal charges were "fully supported by the evidence." (Pl. L.R. 56.1 ¶ 57.)

## DISCUSSION

"The Rehabilitation Act of 1973 protects a 'qualified individual with a disability' from discrimination solely because of the person's disability by any program receiving federal financial assistance. 29 U.S.C. § 794(a)." *Peters v. City of Mauston*, 311 F.3d 835, 842 (7th Cir. 2002). The court looks to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.

8

§§ 12101 *et seq.*, to determine if a violation of the Rehabilitation Act occurs in the employment context. *Id.*, citing 29 U.S.C. § 794(d).

Because Landingham does not proffer direct evidence of discrimination, he proceeds under the familiar burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To prevail on a claim for discrimination under this method, Landingham must make a *prima facie* showing that (1) he is disabled under the Act; (2) he is otherwise qualified for the position sought; (3) he has been excluded from the position solely due to his disability; and (4) the position exists as part of a program or activity receiving federal financial assistance. *Knapp v. Northwestern Univ.*, 101 F.3d 473, 478 (7th Cir. 1996). As relevant here, the parties dispute the first and second elements of the *prima facie* case. If Landingham makes his *prima facie* showing, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Dyrck v. Garvey*, 334 F.3d 590, 598 (7th Cir. 2003). If defendant meets this burden, the burden shifts back to Landingham to show, by a preponderance of the evidence, that defendant's proffered reason was a pretext for intentional discrimination. *Id.* As will be seen below, however, this case is resolved on the disability prong of the *prima facie* case.

An individual is disabled under the RA or ADA if he (1) has a physical or mental impairment that substantially limits one or more major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment by his employer. *Peters*, 311 F.3d at 842, citing 29 U.S.C. 705(20)(b). Landingham argues that his alcoholism and chronic back pain are disabilities under any of the above definitions.

*1.    Landingham's alcoholism*[8]

   *a. Actual disability*

The parties do not dispute that alcoholism is an impairment. 29 C.F.R. § 1630.2(h).[9] Further, Landingham contends that his alcoholism substantially limits the major life activities of seeing, reproducing, learning, bathing and laundering and maintaining family and social relations. Seeing, learning, and bathing and laundering are major life activities under 29 C.F.R. § 1630.2(i) (Major life activities are basic functions of life "such as caring for one's self, performing manual tasks, walking, seeing, hearing, breathing, learning, and working."); *accord, Toyota Motor Mfg. Kentucky, Inc.* v. *Williams*, 534 U.S. 184, 201 (2002) ("Household chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives, and should have been part of the assessment of whether respondent was substantially limited in performing manual tasks."). Moreover, reproduction may be a major life activity. *Bragdon* v. *Abbott*, 524 U.S. 624 (1998) (reproduction is a major life activity for plaintiff, who was infected with HIV, because it affected her decision to have children). Whether family and social relations constitute a major life activity is not established, but at least one court has found it to be so in this context.[10]

---

[8]Landingham first argues that alcoholism is a *per se* disability. The court rejects this argument. *See, e.g., Pernice* v. *City of Chicago*, 237 F.3d 783, 785 (7th Cir. 2001).

[9]A "physical or mental impairment" is "(1) [a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or (2) [a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h).

[10]Plaintiff cites *Olmstead* v. *L.C.*, 527 U.S. 581, 601 (1999), for the proposition that family relations and social contacts are major life activities. As pertinent here, the Supreme Court in *Olmstead* was discussing whether
(continued...)

In response, defendant argues that Landingham cannot show that he is substantially limited in these activities. To be substantially limited, Landingham must show that he is

> [u]nable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(10)(i). Factors to be considered in determining whether an individual is substantially limited in a major life activity include (i) the nature and severity of the impairment; (ii) the expected duration of the impairment; and (iii) the permanent or long term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *Toyota Motor Mfg. Kentucky, Inc.*, 534 U.S. at 198-99. "In addition, the court must take into account the ameliorating or aggravating effects of any corrective devices or mitigating measures, such as medication, on [the plaintiff's] ability to perform a major life activity." *Huizenga v. Elkay Mfg. Co.*, No. 99 C 50287, 2001 WL 640973, at *3 (N.D. Ill. June 5, 2001).

Starting with Landingham's claim that he was substantially limited in seeing and reproducing, he relies only on his own testimony, which lacks foundation and is otherwise insufficient evidence. As for learning, Landingham testified that it took him 30 years to obtain

---

[10](...continued)
confinement instead of community-care programs severely impairs a mentally disabled person's ability to maintain family relations and social contacts. As defendant contends, in a footnote, "[i]t is questionable whether the ability to interact with others is a "major life activity" under the ADA, citing, *inter alia, Soileau v. Guildford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir. 1997) (rejecting the ability to get along with others as a major life activity because the EEOC regulations do not list this ability but noting that the EEOC Compliance Manual did so). (Def. Reply at 5 n.2.)

*Soileau* and its progeny concern social relations between colleagues in professional and educational environments. In *McKay v. Town and Country Cadillac, Inc.*, No. 97 C 2102, 2002 WL 1285065, at *5 (N.D. Ill. June 7, 2002), the court, relying on a previous memorandum opinion and order, determined that family and social relations constitute a major life activity for the plaintiff, who was an alcoholic. For purposes of this discussion, the court accepts the reasoning of *McKay*.

11

his GED. But this fact alone is insufficient to show that his alcoholism substantially limits his ability to learn.

His claim of substantial limitation in interpersonal relations also fails, as Landingham relies on the testimony of psychologist Gerald Rak, although, as defendant points out, Rak's testimony was clear that he did not recall whether he had an opinion with respect to whether Landingham's substance abuse interfered with his interpersonal relationships. (Rak dep. at 46.) Moreover, once again, Landingham relies on his own conclusional testimony as evidence that he separated from his wife because of his alcoholism. No other evidence is pointed to in the record to support this claim.[11] This is but a mere scintilla of evidence and insufficient to withstand summary judgment.

Finally, regarding his personal hygiene, Landingham relies on his testimony that he "sometimes" did not bathe because of his alcohol addiction and "sometimes" did not keep his uniform clean, although Landingham also stated that he kept the uniform clean "most of the time." (Landingham dep. at 150.) This fails to create an issue of fact as to whether Landingham was substantially limited. Accordingly, because Landingham does not establish that any of his major life activities were substantially limited by his alcoholism, he cannot establish disability on this ground.

---

[11]Landingham cites a portion of Dr. Rak's testimony in support of his claim that his alcohol abuse caused him to separate from his wife. However, a close reading of the portions cited (Rak dep. at 46) shows that Dr. Rak was reading from Landingham's own reported social history. (Rak dep. ex. 5.) This does not provide sufficient evidence to establish that his alcohol abuse interfered with his interpersonal relationships.

12

*b. Record of an impairment or regarded as disabled*

Landingham argues that he either had a record of alcoholism sufficient to establish disability under the RA or that the defendant regarded his alcoholism as an impairment that substantially limited major life activities. He relies on the same set of evidence to prove both claims. He argues that he participated in several rehabilitation programs while employed with the USPS, and that on two occasions the USPS referred him to its EAP program for substance abuse treatment. Also, he claims that Averhart sent him to the first aid station on at least one occasion for his alcohol use. From this evidence, Landingham posits that there is no dispute that he had a record of suffering from alcoholism or that the USPS regarded him as being an alcoholic.

Landingham would have a record of impairment if he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). "This provision is intended to address discrimination that occurs because of an individual's history of a disability or because of an individual's misclassification as disabled." *Wheaton v. Ogden Newspapers, Inc.*, 66 F. Supp. 2d 1053, 1065 (N.D. Ia. 1999). As is relevant here, the parties dispute whether defendant was aware of the record in question and whether the record demonstrates a substantial limitation on a major life activity.

Viewing the facts in his favor, Landingham can establish that his USPS supervisors were aware of his drinking. However, having a record of an impairment "requires not simply a diagnosis, but a record reflecting the kind of impairment that would impose a substantial limitation on one or more of the plaintiff's major life activities." *Davidson v. Midelfort Clinic,*

13

*Ltd.*, 133 F.3d 499, 510 n.7 (7th Cir. 1998). Landingham's evidence does show that he participated in rehabilitation programs while employed at the USPS, was referred to the EAP program and Averhart sent him to first aid at least once, but this record does not indicate that Landingham was substantially limited in a major life activity. *E.g., Huizenga*, 2001 WL 640973, at *7 ("It is true the VA medical records refer to Huizenga's anxiety disorder and some of his initial symptoms, but Huizenga has not identified anything in those records (and the court found nothing on its own review) indicating he was substantially limited in a major life activity."). This argument, therefore, fails.

Under the "regarded as" definition of disability, a plaintiff must show that (1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or (2) the employer mistakenly believes that an actual, non-limiting impairment substantially limits a major life activity. *Peters*, 311 F.3d at 843. Although Landingham may be correct that the USPS regarded him as being an alcoholic, regarding an employee as having an impairment is not sufficient under the ADA. Instead, the employer must believe that the employee's impairment substantially limits a major life activity. *See Sutton v. United Air Lines*, 527 U.S. 471, 478 (1999); *Mack v. Great Dane Trailers*, 308 F.3d 776, 780 (7th Cir. 2002). Landingham does not identify which major life activities defendant believed were substantially limited and to the extent he relies on the major life activities listed above, he fails to present evidence to survive summary judgment.

Accordingly, based on the above, Landingham cannot establish that his alcoholism was a disability, and summary judgment must be granted in the defendant's favor on this ground.

2.  *Landingham's Back Problems*

   a.  *Actual disability*

As discussed above, to show actual disability a plaintiff must establish that he or she has a physical or mental impairment that substantially limits one or more major life activities. Once again, the parties do not dispute that Landingham's chronic back pain constitutes a physical impairment. 29 C.F.R. § 1630.2(h). Further, Landingham contends that his chronic back pain is a substantial limitation on his ability to "sleep, walk, sit, stand, twist and bend." Each of these activities has been treated as a major life activity in some form. 29 C.F.R. § 1630.2(i) ("walking"); 29 C.F.R. Pt. 1630, App. § 1630.2(j) (sitting and standing); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 638 (2d Cir. 1998) (assuming, without deciding, that sleeping and bending were major life activities for the plaintiffs, who had back conditions); *Testerman v. Chrysler Corp.*, No. CIV.A. 95-240, 1997 WL 820934, at *10 (D. Del. Dec. 30, 1997) (treating twisting as a major life activity for the plaintiff, who had a back condition). Defendant's response is that Landingham either has proffered inadmissible evidence or has otherwise failed to provide the detailed factual account required to show a substantial limitation.

As with the claim that his alcoholism was an actual disability discussed above, the court agrees with defendant that Landingham has not proffered sufficient proof to show a substantial limitation. To support his claim that his ability to sleep was substantially limited, Landingham does not offer his own testimony but rather that of a doctor, Dr. Cheng, based on notes that he took concerning plaintiff's complaints. As for walking, Landingham testifies only that his pain "hampers" his ability to walk but he does not otherwise show the severity or long term impact. For twisting and bending, Landingham testified that his new position exacerbated his pain.

15

However, because such facts pertain to a four-month period, he otherwise does not show the long term impact of his chronic back pain on such activities.

Concerning sitting and standing, Landingham testified that the pain becomes worse after prolonged periods but that he tolerates the pain. The evidence also shows that he takes medication. Nonetheless, he also testified that he suffers from leg cramps or muscle spasms on a daily basis and in varying degrees of severity. Based on such facts, he arguably shows that his chronic back pain significantly restricts him in the condition, duration and manner of sitting and standing. But without more facts as to how this pain significantly restricts him in such matters in comparison with the average person from the general population, the court is not persuaded that Landingham shows that his chronic back pain poses a substantial limitation on sitting and standing. For these reasons, Landingham does not show that his chronic back pain constitutes an actual disability.

*b. Record of an impairment or regarded as disabled*

Landingham asserts that he had a record of an impairment because he first injured his back on the job and received worker's compensation, was later hospitalized for his back problem and underwent surgery, was assigned to light duty over the years by the USPS, and the USPS admitted that it regarded Landingham as unable to move very quickly. In response, defendant first argues that if, in fact, Landingham had a record of chronic back pain, Averhart never knew of it. At minimum, however, USPS was aware of Landingham's record of chronic back pain. Moreover, Averhart's testimony is subject to scrutiny. Landingham informed Averhart about his back condition when he needed certain leave requests. He also testified that he wore a back

16

brace and it was noticeable through his uniform. From this, there is at least a question of fact as to whether Averhart was aware that Landingham had a record of chronic back pain.

Defendant next argues that even if Averhart was aware of Landingham's medical records, Landingham has failed to demonstrate that the records reflected an impairment that would impose substantial limitations on major life activities. The court agrees. While the record Landingham has put forth may establish that he has back problems (perhaps even chronic back problems), has had surgery and that in certain situations he was assigned to light duty status, there is little evidence advanced that "reflect[s] the kind of impairment that would impose a substantial limitation on one or more of the plaintiff's major life activities." *Davidson*, 133 F.3d at 510 n.7. Landingham's argument on this ground does not survive summary judgment.

With respect to his argument that USPS regarded his back condition as an impairment that substantially affected major life activities, Landingham once again relies on the same evidence above he used to attempt to establish a record of an impairment. Landingham does not clarify what major life activity USPS regarded him as substantially limited in, nor does the record otherwise support Landingham's argument on this ground. This argument is also denied.

In short, while the record shows that Landingham has impairments that may have affected his work performance, including regular attendance, from which it might be possible to infer that the Postal Service was motivated to rid itself of a "problem" employee, Landingham has presented insufficient admissible evidence to create a triable issue as to whether he has a disability as that term is defined under the RA. Because plaintiff is unable to cross this threshold, whether the Postal Service terminated him because of a disability rather than for an appropriate reason is simply not at issue.

## CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment is granted [#48]. The clerk is instructed to enter judgment in favor of the defendant. All future dates, including the October 14, 2003 trial date, are stricken. This case is terminated.

Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Date: September 23, 2003